(77 South. 156)

FIDELITY–PHŒNIX INS. CO. v. WILLIAMS. (8 Div. 943.)

(Supreme Court of Alabama. Nov. 15, 1917.)

1. INSURANCE ⊗⟿335(3) — FORFEITURE FOR BREACH — KEEPING BOOKS, PAPERS, AND SAFE.

Conditions in iron-safe clause that insured merchant "keep a set of books which shall clearly and plainly present a complete record of all business transacted, including all purchases, sales, and shipments, both for cash and credit," did not exact any specific system or form of bookkeeping, or one conforming to the most scientific standards, but would be satisfied if the books kept and records made would fairly show to a man of ordinary intelligence all purchases and sales, both for cash and on credit.

2. INSURANCE ⊗⟿335(3) — FORFEITURE FOR BREACH — KEEPING BOOKS, PAPERS, AND SAFE.

One of the purposes of the iron-safe clause is to prevent perpetration of fraud by assured as to quantum and value of goods destroyed.

3. INSURANCE ⊗⟿335(3)—PAROL EVIDENCE—RECORDS OF INSURED'S BUSINESS.

The requirement in the iron-safe clause of a record of insured's business excludes recourse to parol suggestion, except for the limited purpose of explaining or elucidating the insured's bookkeeping method or entries.

4. INSURANCE ⊗⟿335(3) — IRON-SAFE CLAUSE —SUBSTANTIAL COMPLIANCE.

The requirement of the iron-safe clause that insured keep and produce for the insurer's inspection the record of his business, is not substantially complied with where there is a hiatus for an appreciable period in such record.

5. INSURANCE ⊗⟿335(3) — IRON-SAFE CLAUSE —COMPLIANCE.

Where from an insured merchant's records which did survive fire destroying his stock, it was impossible to ascertain, unaided by recourse to insured's memory, what goods became a part of the stock during the year immediately preceding the fire, or of what the stock actually consisted between the issuance of the policy and the fire, and, in consequence, the value of the insured goods, there was such failure to comply with the requirement in the iron-safe clause as to keeping and producing a complete

record of the business, as would preclude recovery on the policy.

6. INSURANCE ⊙⟳665(8) — ACTIONS — ISSUES AND VARIANCE—WAIVER.

Insured's replication that after insurer's adjuster was fully advised of breaches of policy conditions he assured insured that the policy would be paid, was not supported by evidence that he stated he would do in the premises what one B., an adjuster for other companies, did or would do, and that B. promised to pay the other policies.

Appeal from Law and Equity Court, Morgan County; Thomas W. Wert, Judge.

Action by P. W. Williams against the Fidelity-Phœnix Insurance Company. From Judgment for plaintiff, defendant appeals. Reversed and remanded.

Steiner, Crum & Weil, of Montgomery, and Callahan & Harris, of Decatur, for appellant. Deedmeyer & Birch, of Birmingham, E. W. Godbey, of Decatur, and John R. Sample and Porter M. Brindley, both of Hartsells, for appellee.

McCLELLAN, J. This is a suit instituted by the appellee against the appellant on an insurance policy issued by the appellant to the appellee, indemnifying the appellee to the extent of $2,000, in the event of loss by fire of appellee's stock of merchandise. The stock was destroyed by fire on the night of December 27, 1914, and the plaintiff was accorded a judgment on the policy, to review which judgment the defendant appeals. The chief defenses were predicated of the plaintiff's failure to meet the conditions of the iron-safe clause. This clause provided: "The assured will keep a set of books which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit * * * "—and that the assured would keep such books locked in a fire proof safe at night, and at all times when the building mentioned in the policy was not actually open for business; or, failing this, would keep such books in some place not exposed to fire which would destroy the building; and concluded with the provision that a failure to produce such set of books for the inspection of the company should constitute a bar to a recovery on the policy. The pleas interposed by the defendant invoked defenses arising out of the conditions subsequent created by the indicated clause in the policy. Besides a general traverse of the averments of these pleas, the plaintiff replied, specially, asserting substantial compliance with the terms of the clause, and also, a waiver by one Fitz-Simons, who was defendant's authorized adjuster, of the breaches alleged in the pleas. The defendant's demurrers being overruled to the replications asserting the waiver claimed by the defendant, it rejoined thereto to this effect: That by the terms of the policy no such waiver could be made by an officer, agent, or

representative of the defendant; that a waiver of the terms or conditions of the policy could only be accomplished through a writing indorsed upon or attached to the policy. Demurrers to this rejoinder were sustained. The trial court submitted to the jury's decision the issue whether the books kept by the insured, that were not burned and were produced after the fire for the inspection of the insurer's representative, evidenced a substantial compliance with the mentioned terms of the iron-safe clause. The defendant, through special instructions requested for it, invoked the court to advise the jury that the books produced—the books that survived the fire—did not disclose a compliance with provisions of the iron-safe clause. The particular grounds of defendant's assertion of breaches of this clause were that the insured produced for the inspection of the insurer's agent after the fire no set of books showing a record of purchases and sales as required by the terms of the clause.

[1-3] This clause did not exact any specific system or form of books to be kept by this insured. It did not require such a system of bookkeeping as would conform to the most scientific standards. The exactions of the clause were met if the books kept, the records made, were such as would fairly show to a man of ordinary intelligence all purchases and sales, both for cash and on credit. Liverpool, etc., Ins. Co. v. Kearney, 180 U. S. 132, 136, 21 Sup. Ct. 326, 45 L. Ed. 460. One of the purposes of the clause is to prevent the "perpetration of any fraud by the assured with respect to the quantum and value of the goods destroyed." Hanover Ins. Co. v. Crawford, 121 Ala. 258, 262, 25 South. 912, 77 Am. St. Rep. 55; Chamberlain v. Shawnee Ins. Co., 177 Ala. 516, 519, 58 South. 267. The clause, itself, expressly required a record of the business; thereby excluding recourse to parol suggestion otherwise than for the limited purpose of explaining or elucidating the method of bookkeeping employed by the insured, or entries made in the course of constituting the record of the business. Home Ins. Co. v. Williams, 237 Fed. 171, 177, 150 C. C. A. 317; Chamberlain v. Shawnee Ins. Co., supra; Ga. Home Ins. Co. v. Allen, 119 Ala. 436, 24 South. 399. It is generally accepted that substantial compliance with the prescriptions of the clause is all that is required. 14 R. C. L. pp. 1139, 1140; note, Ann. Cas. 1913C, p. 1221; note, 14 Ann. Cas. pp. 1079, 1080; Ga. Home Ins. Co. v. Allen, supra.

[4] It is very clear, we think, that no substantial compliance with the plain prescriptions of the clause is shown where, in the record history of the business, there is a hiatus—for an appreciable period—in the record of business which the terms of the clause required the insured to keep and to

produce for the inspection of the insurer. Chamberlain v. Shawnee Ins. Co., 177 Ala. 516, 58 South. 267; Ga. Home Ins. Co. v. Allen, 119 Ala. 436, 24 South. 399; Hanover Ins. Co. v. Crawford, 121 Ala. 258, 25 South. 912, 77 Am. St. Rep. 55. The insured had and produced an inventory taken about January 1, 1914. Beginning on January 1, 1914, the insured kept a "cash book" that was filled by October 16, 1914. This book, being left out of the insured's iron safe after it was filled, was destroyed by fire on December 27, 1914. The insured opened another cash book on October 16, 1914, and, after the fire, produced this book for the adjuster's inspection. The insured produced for the adjuster's inspection a "ledger for 1914; that is an account book and ledger," wherein the insured "posted all charges for 1914." The insured testified:

"I showed him a wholesale book that I kept; my wholesale book that I kept my wholesale bills in; that is the book where I kept the amount of the bills, of invoices, from the wholesale people, the amount that I purchased from them. When I got a bill in I would check the bill and mark it up and credit that firm with the amount of it. For instance, if I bought a bill from A. B. Miller, a wholesaler, this wholesale book would show A. B. Miller $1,000. In addition to these books, I showed him a bank record or book in which I kept the record of my checks and deposits. It is kinder like a passbook, only it is itemized. When I would draw a check on the bank I would put in that book the date of the check, to whom, and the amount in which it was drawn; and when I would make a deposit in bank I would put in that book the date of the deposit and the amount of the deposit, and by taking the checks that I had drawn and the amount of my deposits I could ascertain my standing with the bank."

The cash book covering the business between January 1, 1914, and October 16, 1914 —a book that was left out of the safe and burned—"showed the cash sales and the credit sales and the cash received and the cash paid out. It showed the total business." The insured further testified that he "preserved the bills and invoices of goods that I [he] received during the year 1914"; that he "left these out of the safe and they were destroyed by fire"; that he "had no record of any kind of my [his] purchases other than the wholesale book which only showed the name of the person from whom I [he] had bought the goods and the amount I [he] owed them; it just showed totals; it did not show any items;" that insured "checked the items against the invoices before entering the totals in the wholesale book." The insured further testified:

"After the fire and after the destruction of my invoices I had no record which showed the goods I had purchased during the year other than this wholesale book. * * * From that book I had no way of telling the kind of goods I had bought other than the name of the concern I had bought goods from; if it was a hat man, I could tell it was hats. This record would not show it. This book containing my account with the bank only showed the cash record of the amount that would be deposited and the amount of the checks, and did not show the source from which I received the money which I deposited in the bank."

The insured was also engaged in buying and selling vehicles, mules, and cotton. He testified that he borrowed money during the year from the bank; that the amount borrowed by him was shown by his passbook, and that this passbook was destroyed by fire. From the records produced by the insured for the inspection of the insurer's agent after the fire, it was not possible, without the material aid of the insured's recital from memory, to ascertain what items on the bank book were the product of the collateral transactions or of money borrowed by the insured.

[5] In this state of the insured's own evidence, the jury should have been advised, as the defendant sought to have done, that the record the insured had engaged, in the "iron-safe clause," to keep and to produce was not produced for the inspection of the insurer's representative. He did not preserve, as he engaged to do, a record of all purchases and sales within the requirements of the "iron-safe clause." If the records insured kept, viz. inventory taken in January, 1914, invoices, ledger, cash book (from January 1, 1914, to October 16, 1914) and the succeeding cash book had been preserved by being kept in the safe at night, he would have saved from the fire a sufficient record to have met the exactions of this feature of his contract. From the records that did survive the fire—unsupplemented by recourse to the insured's memory—it was not possible to ascertain what goods became a part of the stock during the year 1914, or of what the stock actually consisted between the issuance of this policy in September, 1914, and the date of the fire and, in consequence, the value of the goods insured against loss by fire under this policy. The Court of Appeals of the Fifth Circuit concluded to the same, effect in reviewing judgments in favor of this insured (appellee) on policies concurrent with that here involved. Home Ins. Co. v. Williams, 237 Fed. 171, 150 C. C. A. 317. Since the evidence disclosed without dispute a failure of the insured to meet the obligations, the promissory warranties assumed by him through the stated features of the "iron-safe clause," the defendant was erroneously refused instructions so concluding.

[6] The waiver set forth in the plaintiff's replications included an assertion that after Fitz-Simons was fully advised of the breaches of the iron-safe clause he assured the insured that the policy here in question would be paid. The evidence does not support this material averment of the replications. Whether the statement of Fitz-Simons—testified to by plaintiff—that he would do in the premises what Mr. Brame, an adjuster for other companies, did or would do, and that Brame promised to pay the policies, in fact, effected a waiver of the forfeiture asserted in the defendant's plea, is a question not presented

by the replications as they are now constructed. The present replications of this class assert a waiver by Fitz-Simons' acts and declarations, without reference to the acts or declaratibns of the agent of other companies concerned in the adjustment of their losses, if so, under other policies. To now undertake the consideration and decision of legal questions arising out of those circumstances would involve the court in pronouncements not invited by the issues made by the parties through their pleadings.

It results that the defendant was entitled, on this record, to the general affirmative charge, which was erroneously refused to it.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and GARDNER, JJ., concur.